## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

Docket Number(s): __24-2545__    __Hercules Pharmaceuticals, Inc. v. Cherne__

Motion for: __Emergency Motion for Stay and__

__Expedited Appeal__

Set forth below precise, complete statement of relief sought:

Defendant-Appellant Brant Cherne seeks an order staying the Preliminary Injunction ("PI")

entered against him by the District Court and expediting his appeal of same based on

the fact that he will suffer irreparable harm in the absence of relief. Plaintiff-Appellee's

overbroad and unduly burdensome non-compete provision in its employment with Cherne

effectively bars Cherne from working in his chosen career field for an entire year. The

PI financially harms both Cherne and his family, who are financially dependent on Cherne.

MOVING PARTY: __Brant Cherne__    OPPOSING PARTY: __Hercules Pharmaceuticals, Inc.__

☐ Plaintiff    ☒ Defendant

☐ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: __Jamie S. Felsen, Esq.__    OPPOSING ATTORNEY: __Richard C. Schoenstein, Esq.__

[name of attorney, with firm, address, phone number and e-mail]

Milman Labuda Law Group PLLC    Tarter Krinsky & Drogin LLP

3000 Marcus Avenue, Suite 3W8, Lake Success, NY 11042    1350 Broadway, 11th Floor, New York, NY 10018

(516) 328-8899; jamiefelsen@mllaborlaw.com    (212) 216-8000; rschoenstein@tarterkrinsky.com

Court- Judge/ Agency appealed from: __Eastern District of New York (EDNY) - Seybert, J.__

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☒ Yes ☐ No (explain): _____

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?    ☒ Yes ☐ No
Has this relief been previously sought in this court?    ☐ Yes ☒ No

Requested return date and explanation of emergency: __October 18, 2024__

Defendant-Appellant Brant Cherne will be irreparably harmed in the absence of a stay of
the District Court's grant of the PI against him, pending appeal, as he and his family will be
financially harmed if he is barred from working in the only industry in which he has built his career.
Public policy weighs against enforcing the overly broad non-compete agreement against Mr. Cherne.

Opposing counsel's position on motion:
☐ Unopposed ☒ Opposed ☐ Don't Know

Does opposing counsel intend to file a response:
☒ Yes ☐ No ☐ Don't Know

Is the oral argument on motion requested? ☒ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set? ☐ Yes ☒ No  If yes, enter date: _____

Signature of Moving Attorney:

_____ Date: __October 15, 2024__    Service : ☒ Electronic ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

**UNITED STATES COURT OF APPEALS**
**SECOND CIRCUIT**
--------------------------------------------------------X
**HERCULES PHARMACEUTICALS, INC.,**

                                               **Case No.: 24-2545**

            **Plaintiff-Appellee,**


        **- against -**


**BRANT CHERNE,**

            **Defendant-Appellant.**
--------------------------------------------------------X



**DEFENDANT-APPELLANT BRANT CHERNE'S MEMORANDUM OF**
**LAW IN SUPPORT OF HIS EMERGENCY MOTION FOR A STAY AND**
**EXPEDITED APPEAL**



**Milman Labuda Law Group PLLC**
**3000 Marcus Ave**
**Suite 3W8**
**Lake Success, NY 11042**

# TABLE OF CONTENTS

PRELIMNARY STATEMENT......................................................................1

STANDARD................................................................................................2

ARGUMENT ..............................................................................................3

POINT I......................................................................................................3

CHERNE IS LIKELY TO SUCCEED ON THE MERITS AS THE NON-COMPETE AGREEMENT IS UNENFORCEABLE .................................3

    A.    Cherne's reduced compensation relieved him of his obligations. ...........3

    B.    The noncompete provision, as interpreted by the District Court, is impermissibly overbroad ...................................................................6

        1.   The non-compete provision is unduly broad ...............................7

        2.   Prohibiting Cherne from working in the entire pharmaceutical industry does not protect a legitimate interest....................................11

POINT II ..................................................................................................15

CHERNE WILL BE IRRPERABLY HARMED ABSENT A STAY ................15

POINT III ................................................................................................18

THE ISSUANCE OF A STAY WILL NOT SUBSTANTIALLY INJURE HERCULES....................................................................................19

POINT IV .................................................................................................21

THE PUBLIC HAS A STRONG INTEREST IN ALLOWING INDIVIDUALS TO WORK AND SUPPORT THEIR FAMILIES ...........................21

POINT V ..................................................................................................22

THE APPEAL SHOULD BE DECIDED ON AN EXPEDITED BASIS BECAUSE CHERNE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF RELIEF .................................................................22

CONCLUSION..........................................................................................22

# TABLE OF AUTHORITIES

## Cases

*24 Seven, LLC, v. Martinez*, 2021 U.S. Dist. LEXIS 15480 (S.D.N.Y. 2021).........13

*Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382 (2d Cir. 1982)............14

*Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22 (S.D.N.Y. 2010). ........................6

*Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13 (2d Cir. 1987)...................19

*Bertuzzi v. Chase Manhattan Bank, N.A.*, 1999 U.S. Dist. LEXIS 14831 (S.D.N.Y. 1999) ...........................................................................................................6

*DS Parent, Inc. v. Teich*, 2014 U.S. Dist. LEXIS 16116 (N.D.N.Y. Feb. 10, 2014) ...................................................................................................................18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) ...12

*Fisher v. Global Values, Inc.*, 2006 U.S. Dist. LEXIS 85029 (D. Vt. Nov. 2, 2006) ...................................................................................................................18

*Flatiron Health, Inc. v. Carson*, 2020 U.S. Dist. LEXIS 48699 (S.D.N.Y. 2020)6, 9, 12, 17

*Freedom Holdings Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) .............. 13, 14

*General Mills v. Champion Petfoods USA, Inc.*, No. 20-cv-181, 2020 WL 915824 (S.D.N.Y. 2020) ......................................................................................10, 11

*Grynberg v. BP, P.L.C.*, 2011 WL 1161540 (S.D.N.Y. 2011), aff'd, 469 F. App'x 5 (2d Cir. 2012) ...............................................................................................13

*Ivy Mar Co. v. C.R. Seasons*, 907 F. Supp. 547 (E.D.N.Y. 1995).............................13

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149 (2d Cir. 1998) ...............................................6

*Magtoles v. United Staffing Registry, Inc.*, 2021 U.S. Dist. LEXIS 248070 (E.D.N.Y. Dec. 30, 2021)...........................................................................9, 17

*Maldonado-Padilla v. Holder*, 651 F.3d 325 (2d Cir. 2011)......................................3

*Morris v. N.Y. City Dep't of Sanitation*, 2003 U.S. Dist. LEXIS 5146 (S.D.N.Y. 2003) ...........................................................................................................6

*N.Y. Packaging II LLC v. Mustang Mktg. Grp. LLC*, 2022 U.S. Dist. LEXIS 35980 (E.D.N.Y. March 1, 2022)...............................................................................13

*NAS Elecs. V. Transtech Elecs. PTE*, 262 F. Supp. 2d 134 (S.D.N.Y. 2003).............5

*New Windsor Volunteer Ambulance Corps., Inc v. Meyers*, 442 F.3d 101 (2d Cir. 2006) ...........................................................................................................4

*Nken v. Holder*, 556 U.S. 418 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009) ...............3

*Pella Windows & Doors v. Buscarnera*, 2007 U.S. Dist. LEXIS 52382 (E.D.N.Y. July 19, 2007) .............................................................................. 17, 18

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489 (S.D.N.Y. Sept. 12, 2011) ................................................................9

*Romer v. Green Point Sav. Bank*, 27 F.3d 12 (2d Cir. 1994) ....................................2

*Steelite Int'l U.S.A., Inc. v. McManus*, 2021 U.S. Dist. LEXIS 80528 (S.D.N.Y. 2021) ................................................................................ 9, 10, 21

*TGG Ultimate Holdings, Inc. v. Hollett*, 2016 U.S. Dist. LEXIS 188014 (E.D.N.Y. 2016) .............................................................................................14

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999) ......................................11

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209 (S.D.N.Y. 2014) ................................................................................ 19, 20

*Yedlin v. Lieberman*, 102 A.D.3d 769 (2d Dept. 2013)............................................9

**Statutes**

28 U.S.C. § 1292(a) .................................................................................................2

**Rules**

Federal Rules of Appellate Procedure, Rule 8 .....................................................1, 2

## PRELIMNARY STATEMENT

This motion seeks a stay of the portion of the preliminary injunction ("PI") issued by the District Court, Seybert, J. (Index No. 24-cv-5659) on September 18, 2024 that, *inter alia*, precludes Defendant-Appellant Brant Cherne ("Cherne") from engaging in employment in the pharmaceutical industry for a period of one (1) year, including working for NDC Distributors ("NDC"), pending the outcome of Cherne's appeal, which will result in significant personal financial and professional hardship. Cherne respectfully submits that the non-compete provision enforced by the District Court is void for a variety of reasons and will lead to irreparable harm to Cherne.

Cherne can establish each of the factors this Court must consider under Rule 8 of the Federal Rules of Appellate Procedure ("Fed. R. App. Pro.").

First, Cherne is likely to succeed on the merits of his appeal because the non-compete provision in Cherne's agreement with Plaintiff Hercules Pharmaceuticals, Inc.'s ("Hercules") is unenforceable due to Hercules' material breaches of its agreement with Cherne, including the significant reduction in Cherne's compensation structure and its overbreadth and lack of legitimate interest. Second, absent a stay, Cherne will face irreparable harm as he will be barred from working in the industry where he has built his career over the past six years. The harm to his ability to support his family financially far outweighs any speculative harm to Hercules. Third, Hercules will not suffer any substantial injury from a stay, as

Cherne has returned all proprietary information and there is no indication that Hercules has suffered any financial losses since Cherne's departure more than two months ago. Lastly, the public interest strongly favors permitting Cherne to continue earning a livelihood in his chosen profession, as overly restrictive non-compete provisions are disfavored in New York due to their negative impact on employee mobility and competition.

Accordingly, Cherne respectfully requests that the Court grant his motion for a stay pending appeal and decide the appeal on an expedited basis.

## STANDARD

This Court has jurisdiction to hear the underlying appeal pursuant to 28 U.S.C. § 1292(a). As such, this Court also has jurisdiction to hear the instant motion. *See Romer v. Green Point Sav. Bank*, 27 F.3d 12, 15 (2d Cir. 1994). Further, this motion is appropriately before this Court in accordance with Fed. R. App. Pro. 8(2)(A) because the District Court denied Cherne's motion to stay the preliminary injunction on October 1, 2024.[1] *See* Declaration of Jamie Felsen ("Felsen Decl."); Fed. R. App. Pro. Rule 8(2)(A).

---

[1] The District Court wrongly denied the motion for a stay because, *inter alia*, it deemed it to be a motion for reconsideration of its order granting the preliminary injunction, despite the elements for a motion for a stay being similar to the elements for a motion for a preliminary injunction and the obligation that Cherne first seek a stay with the District Court prior to seeking a stay before the Second Circuit.

To determine whether to stay a preliminary injunction, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;  (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, (2009).  Generally, the applicant's likelihood of success on the merits and irreparable harm to the applicant absent a stay "are the most critical" factors in determining whether one is appropriate.  *Nken*, 556 U.S. at 434. "[T]he party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Maldonado-Padilla v. Holder*, 651 F.3d 325, 328 (2d Cir. 2011).

## ARGUMENT

## POINT I

## CHERNE IS LIKELY TO SUCCEED ON THE MERITS AS THE NON-COMPETE AGREEMENT IS UNENFORCEABLE[2]

### A. Cherne's reduced compensation relieved him of his obligations.

The District Court abused its discretion in concluding that the Employee Confidentiality and Non-Compete Agreement between Cherne and Hercules

---

[2] This motion for a stay is limited to seeking a stay of the non-compete portion of the Agreement as enforcement of that provision, unlike the other provisions, will cause Cherne irreparable harm if a stay is not issued. Cherne reserves all rights to appeal the entirety of the order granting Hercules' motion for a preliminary injunction.

executed in 2022 ("Agreement") (Felsen Decl., Ex. "B") is valid and enforceable based on Cherne's testimony that it is a valid Agreement. Cherne explained that he testified that the Agreement is valid merely because he does not dispute signing it; he did not concede that every provision within it is legally enforceable. Felsen Decl. Ex. C, ¶ 15. Cherne is not an attorney or a judge and would not know if each and every term in a restrictive covenant agreement is legally enforceable. *Id.*

"When a party has breached a contract, that breach may excuse the non-breaching party from further performance if the breach is material." *New Windsor Volunteer Ambulance Corps., Inc v. Meyers*, 442 F.3d 101, 117 (2d Cir. 2006).

The Agreement was explicitly tied to Cherne's compensation and employment benefits at the time he executed the Agreement in 2022:

> Because of Employer's legitimate business interest as described herein and the good and valuable consideration, including the pharmaceutical industry knowledge, salary, and <u>monetary benefits</u> from employment, offered to the Employee …

Felsen Decl., Ex. B, § 3(c)(i) (emphasis added).

The Agreement also states:

> b. Sufficient Consideration. Employee acknowledges and agrees that: … (B) <u>the amount of the Employee's compensation</u> reflects, in part, the Employee's obligations and the Employer's rights under this Agreement; …

*Id.* at § 4(b) (emphasis added).

4

On several occasions after Cherne signed the Agreement, Hercules altered Cherne's commission structure making it more difficult for Cherne to earn commissions.[3] Based on the substantially reduced commission structure, Cherne had to sell double to earn more, but his income did not double each year; it only slightly increased. *See* Felsen Decl., Ex. C ¶¶ 56-59.

Hercules' reduction of Cherne's commission structure—which formed the core of his compensation—constituted a material breach, excusing Cherne from further performance under the Agreement, specifically, as relevant on this motion, his obligation to adhere to the non-compete provision. Cherne's right to continue receiving commissions under the commission plan that existed at the time he signed the Agreement was the basis for his acceptance of the Agreement's restrictions. When Hercules unilaterally modified his commission structure multiple times, the original consideration ceased to exist, rendering the Agreement void. *NAS Elecs. V. Transtech Elecs. PTE*, 262 F. Supp. 2d 134, 145 (S.D.N.Y. 2003) (material breaches, especially in compensation, grant the non-breaching party the right to terminate the contract and cease further obligations.) Here, Hercules' failure to adhere to the

---

[3] Specifically, in July 2022, Cherne was told that the commission for Lenalidomide, which had expected to be 2%, would be reduced to 0.5%. *See* Felsen Decl., Exh. C ¶ 56. In June 2023, Cherne was told that pharmacies with drug spends of over $200M would have to be shared with his coworkers and that the shared commission would be reduced to 0.5% percent each. *Id*. at ¶ 57. In June 2024, Cherne was told that commissions on bio-similar products would be reduced to $1 per unit, which was a massive cut. *Id*. at ¶ 58. In 2021, Cherne sold $25 million in revenue. In 2022, he sold $50 million in revenue. In 2023, he sold $100 million in revenue. In 2024, he sold close to $60 million in revenue prior to resigning on August 1, 2024. *Id*. at ¶ 59.

agreed commission schedule qualifies as a material breach, and as such, Cherne is relieved from compliance with the non-compete provision.

Moreover, by substantially diminishing Cherne's commission structure, Cherne was constructively discharged. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 157-58, 161-62 (2d Cir. 1998); *Morris v. N.Y. City Dep't of Sanitation*, 2003 U.S. Dist. LEXIS 5146, at *2-4, 14-15 (S.D.N.Y. 2003). A non-compete agreement is unenforceable where, as here, the employee is terminated. *See Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22 (S.D.N.Y. 2010). A constructive discharge is akin to an involuntary termination. *See Bertuzzi v. Chase Manhattan Bank, N.A.*, 1999 U.S. Dist. LEXIS 14831 (S.D.N.Y. 1999).

Accordingly, Cherne is likely to succeed in establishing that the non-compete provision in the Agreement is void.

## B. The noncompete provision, as interpreted by the District Court, is impermissibly overbroad

"Non-compete provisions are enforceable under New York law only if they are (1) reasonable in duration and geographic scope, (2) necessary to protect the employer's legitimate interests, (3) not harmful to the general public, and (4) not unreasonably burdensome to the employee." *Flatiron Health, Inc. v. Carson*, 2020 U.S. Dist. LEXIS 48699, at *54 (S.D.N.Y. 2020) ("A violation of any prong renders the [non-compete] invalid").

### 1. The non-compete provision is unduly broad

The non-compete provision in the Agreement prohibits Cherne from engaging in "Prohibited Activity", which is defined as:

> [A]ctivity in which the **Employee** contributes their knowledge (whether directly or indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity) to an entity engaged in any business that competes with Employer, *by selling any product or service sold by Employer*. Prohibited Activity also includes activity that may require or inevitably require disclosure of Confidential Information.

*See* Felsen Decl., Ex. B, § 3(c)(ii) (emphasis added).

Critically, this provision prohibits Cherne from *selling*[4] any product or service *sold by Cherne* at Hercules. It does not prohibit him from *buying* any product or service sold by Hercules.[5]

Prior to being prohibited by the District Court from working for NDC, Cherne's responsibilities at NDC involved buying drugs from manufacturers and expanding NDC's distribution network, not selling drugs to customers. *See* Felsen Decl., Ex. C ¶¶ 5-7, 53. At NDC, Cherne was not engaged in selling any products

---

[4] Notably, a separate provision in the Agreement - the non-solicitation provision - is limited specifically to prohibiting solicitation of *customers* (*See* Felsen Decl., Ex. B, (3)(e)) and does not extend to manufacturers, which is the role in which Cherne was performing at NDC. This is evidence that the Agreement's purpose relates solely to **customers** Cherne sold drugs to on behalf of Hercules - not manufacturers, that he did not work with or buy from, when he worked at Hercules.

[5] Nor does it prohibit him from selling any product or service that he did not personally sell for Hercules (although, notably, he is not selling for NDC, he would only be buying for NDC).

or services that Hercules sells. His role at NDC was limited to building manufacturer relations, and purchasing medicines from manufacturers, which does not involve sales and, thus, does not fall under the activities prohibited by the non-compete. *Id*. The agreement specifically restricts *selling*, not activities related to distribution or buying. Thus, Cherne's role at NDC did not constitute "Prohibited Activity" under the agreement, as he was hired for a non-sales role. Furthermore, Cherne's role at NDC did not require the disclosure or use of any confidential information from Hercules.

At Hercules, Cherne was a "front-of-the-house" salesperson who sold medicine to pharmacies. *See* Felsen Decl., Ex. C ¶¶ 4-7. Cherne did not sell anything to manufacturers with whom Hercules did business, and he did not negotiate wholesale prices or execute purchases with manufacturers. *Id*. ¶¶ 18, 44, 46-47, 52. Working with, meeting with, negotiating with, or buying from, manufacturers were not under the purview of Cherne's job responsibilities at Hercules. *Id*. ¶ 43. He had no involvement with negotiating with manufacturers or communicating with manufacturers regarding the price Hercules paid manufacturers. *Id*. ¶¶ 44-46. He had no knowledge of the contracts or any of the agreements that took place with the manufacturers. Cherne was not involved in the pricing mechanisms or the algorithms that were used to price a product; once

Hercules received the product, his only job was to work with customers to try to get them to buy the product from Hercules. *Id*. ¶ 47.

Since Cherne would not be selling for NDC, Cherne cannot be prohibited from working for NDC.

The District Court's interpretation of "Prohibited Activity" appears to prohibit Cherne from working in any position for any entity that sells products or services sold by Hercules, regardless of his role. Because manufacturers and health care providers sell some of the same products as Hercules (*Id*. ¶¶ 10-14), the non-compete effectively bars Cherne from the entire pharmaceutical industry throughout the United States for an entire year, which is overly broad and unreasonable. *See Carson*, 2020 U.S. Dist. LEXIS 48699 at 53-54 (non-compete preventing an employee from working in an entire industry is unenforceable); *Magtoles v. United Staffing Registry, Inc.*, 2021 U.S. Dist. LEXIS 248070 *19 (E.D.N.Y. 2021) (same); *Steelite Int'l U.S.A., Inc. v. McManus*, 2021 U.S. Dist. LEXIS 80528, *21 (S.D.N.Y. 2021) (non-compete containing no geographic scope unenforceable); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (worldwide ban unenforceable); *Yedlin v. Lieberman*, 102 A.D.3d 769 (2d Dept. 2013) (nationwide non-compete unenforceable).

It is respectfully submitted that the District Court's interpretation and application of the non-compete provision is incorrect as it does not prohibit Cherne

from buying from manufacturers. The District Court has interpreted the non-compete provision to say what it does not say and, in doing so, has placed an unreasonable burden on Cherne by restricting him from engaging in any employment in the pharmaceutical industry nationwide for an entire year.

The reasonableness of a non-compete provision is assessed also in light of the circumstances in which it was negotiated, including whether it was negotiated by a sophisticated businessman and whether the defendant was coerced into agreeing to it covenant or lacked any meaningful choice with regard to accepting it. *McManus*, 2021 U.S. Dist. LEXIS 80528 at *20. Here, Cherne, who is not a sophisticated businessman and who does not negotiate complex contracts (he is merely a W2 employee), was presented with an ultimatum to sign the Agreement containing broad restrictive covenants or be terminated. *See* Felsen Decl., Ex. C ¶ 9. This fact also weighs against enforcement of the overbroad and unreasonable non-compete, particularly given the hardship that Cherne will face if it is enforced. *McManus* at 20-21.

Accordingly, the non-compete provision is impermissibly broad and unduly burdensome to Cherne's ability to earn a living and cannot be enforced.

To the extent that Hercules will rely on *General Mills v. Champion Petfoods USA, Inc.*, No. 20-cv-181, 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020) in its opposition to this motion (as it did in the District Court), such reliance would be

misplaced. In *General Mills*, although the district court denied a motion for a stay of enforcement of a non-compete provision pending an appeal, the facts in *General Mills* were vastly different than the facts here. In *General Mills*, the defendant was a high-level executive who possessed proprietary formulas and resigned his employment with General Mills to be a high-level executive at a competitor. In the instant case, Cherne was not a high-level executive. He was not even an executive. He was a salesperson. Moreover, unlike the high-level executive in *General Mills*, Cherne had no access to proprietary formulas.

### 2. Prohibiting Cherne from working in the entire pharmaceutical industry does not protect a legitimate interest

Non-compete provisions are enforceable only when necessary to protect legitimate interests, such as preventing the use of trade secrets, customer lists, or when the employee's services are deemed special or unique. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). Hercules has failed to demonstrate that such interests are present in this case, nor has it identified any specific trade secrets Cherne might use to compete.

At the TRO hearing, Hercules painted itself as a "disruptor" in the pharmaceutical industry. *See* Felsen Decl., Ex. C, Ex. A. Tr. 14:7-18; 43:11-44:24. However, Hercules failed to link its proprietary information—namely an algorithm developed by Hercules' staff—with Cherne's role or access. *See* Felsen Decl., Ex. C ¶ 27. Hercules claims that the "proprietary information" that was stolen (albeit

still with no supporting evidence) is an algorithm developed in-house by a staff of "Ivy League" types - *with which Cherne had no involvement or access*. *Id*. Hercules' testimony omitted any discussion of manufacturers in the context of the "proprietary information." *Id*. Cherne was not involved in developing or accessing any proprietary information, algorithms, or customer lists involving manufacturers. *Id*. ¶ 47. Hercules' attempt to retroactively classify manufacturers as "customers" in the context of proprietary information is unsupported by both the contract language and the evidence. The clear shoehorning in manufacturers as "customers" was an afterthought and wholly unsupported by the contract language at issue. Therefore, Hercules does not have a legitimate interest in preventing Cherne from exclusively buying from manufacturers. *See Carson*, 2020 U.S. Dist. LEXIS 48699 at *54.

Customer lists and pricing information are not trade secrets[6] when they are easily obtainable from public sources or readily available by contacting customers directly. *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Moreover, information that becomes stale or outdated quickly is not a

---

[6] Hercules has failed to take reasonable steps to protect the alleged confidential information. There is no evidence that Hercules utilized confidentiality agreements, encryption, or other standard practices to safeguard this information. Moreover, Hercules set up Cherne's personal phone to be used by him to perform his job duties and took no steps to protect its information that he used in the regular course of conducting Hercules business on his personal phone. *See* Felsen Decl., Ex. C ¶ 35. This lack of protective measures significantly undermines its claim that the information qualifies as a trade secret. Without taking such steps to protect its confidentiality, Hercules cannot credibly argue that the information should now be considered secret under the law.

trade secret. *See, e.g., Grynberg v. BP, P.L.C.*, 2011 WL 1161540, at *11 (S.D.N.Y. 2011), aff'd, 469 F. App'x 5 (2d Cir. 2012); *Ivy Mar Co. v. C.R. Seasons*, 907 F. Supp. 547, 558 (E.D.N.Y. 1995); *24 Seven, LLC, v. Martinez*, 2021 U.S. Dist. LEXIS 15480, *23 (S.D.N.Y. 2021). Conclusory proof about compilation of pricing and sales information detached from any propriety pricing approach is insufficient. *N.Y. Packaging II LLC v. Mustang Mktg. Grp. LLC*, 2022 U.S. Dist. LEXIS 35980 (E.D.N.Y. 2022) ("RediBag's conclusory proof about its compilation of "pricing" and "sales" information" do not tie to an "algorithm," "analytic model," or propriety pricing approach"; moreover, RediBag failed to demonstrate that its pricing, sales, and product information were not already available to its competitors.)

Customer usage and pricing data fluctuate frequently in the pharmaceutical industry, including at Hercules, and the prices Cherne worked with were publicly available, or easily obtained through pharmacies and manufacturers or common industry channels; Hercules even required Cherne to obtain Hercules' competitors' prices and include same in Hercules portal. *See* Felsen Decl., Ex. C ¶¶ 16, 19-25.

Moreover, Hercules has not demonstrated any harm resulting from Cherne's employment at NDC, and there is no threat of dissemination as all documents in Cherne's possession have already been returned and will be destroyed by Cherne once permitted by the District Court. *See* Felsen Decl., Ex. C ¶¶ 16, 79-81. The mere retention of limited information, which has not been used to Hercules'

detriment, cannot establish irreparable harm. *See Freedom Holdings Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). Without any demonstrable harm or threat of disclosure, the broad restrictions imposed by the non-compete clause are unjustified. Any prior concern of a threat of dissemination has been eliminated and Hercules can no longer rely upon Cherne's prior access to Hercules' information to demonstrate irreparable harm. *See Spitzer*, 408 F.3d at 114  (holding that merely retaining such limited information does not establish that such conduct will actually and imminently incur harm that is in fact irreparable).

Moreover, Cherne's role at Hercules was not of such a unique or specialized nature that it warrants protection through a non-compete. He was a salesperson. Cherne had no authority to set prices or negotiate manufacturer relationships, or the prices Hercules paid manufacturers for the product it received. (Felsen Decl., Ex. B, Ex. A Tr. 72-73: 21-25; 1-3).  His position was not of such a unique character as to make him irreplaceable, and therefore, does not meet the standard of "special or unique" services that would justify the enforcement of a non-compete. *See TGG Ultimate Holdings, Inc. v. Hollett*, 2016 U.S. Dist. LEXIS 188014, *15 (E.D.N.Y. 2016), *citing Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 390 n.9 (2d Cir. 1982).

In sum, Hercules has not established that Cherne poses any legitimate threat to its business. Accordingly, the non-compete provision, as interpreted by the Court, is overly broad and unenforceable under New York law.[7]

## POINT II

## CHERNE WILL BE IRRPERABLY HARMED ABSENT A STAY

The injunction barring Cherne from working in the pharmaceutical industry **within the entire United States** for an **entire year** will cause him irreparable harm. The non-compete effectively strips Cherne of his livelihood during a critical period in his life, as he has a wife and two infant children, and another child on the way, who depend on him financially.

Cherne has approximately $20,000 in monthly family expenses. Declaration of Brant Cherne ("Cherne Decl."), ¶ 4. His family relies on his substantial income to pay for an overwhelming majority of his household expenses. *See* Felsen Decl., Ex. C , Ex. A Tr. 171:18-172:5; *see also* Cherne Decl. ¶ 3. Cherne has no current income as NDC has ceased paying his salary. Cherne Decl., ¶ 5. Although Cherne's wife works, her $4,000 net monthly compensation will not come remotely close to

---

[7] Non-compete agreements are frowned upon and there is a growing recognition that such restrictions are harmful and unreasonable. Indeed, the Federal Trade Commission and New York legislature have recently attempted to ban them because they are often overly restrictive and harmful to employees like Cherne.

paying their monthly family expenses. [8] *Id*. ¶ 6. Cherne and his wife have approximately $90,000 in their savings account, but they owe $80,000 to the IRS. *Id*. ¶ 7. Cherne is unable to borrow money from his family to cover his monthly expenses and it is unlikely that he can obtain a loan from a bank given that he is currently unemployed and in litigation. *Id*. ¶ 9.

Although NDC is contractually obligated to indemnify Cherne from all litigation with Hercules, if NDC stops paying Cherne's legal bills, and arbitration fees (Cherne is responsible for 50% of the arbitration fees) as it has stopped paying his salary, Cherne will be placed in further financial peril. *Id*. ¶ 10.

Cherne has applied to approximately sixty (60) jobs without any success. *Id*. ¶ 11. It has been extremely difficult for Cherne to find sales jobs for which he is qualified that would compensate him comparably to what he earned at Hercules or even the reduced salary he took with NDC. Although Cherne earned approximately $680,000 at Hercules in 2023, Cherne earned $127,000 in each of the first two years that he worked at Hercules while he learned the industry. Having to obtain a sales job outside of the pharmaceutical industry would require Cherne to start from scratch again learning a new industry with a substantially lower salary, likely close to what he earned seven years ago when he started out at Hercules. *Id*. ¶ 14.

---

[8] Although Hercules posted a $400,000 bond, Cherne would not receive that money until he prevails in the underlying arbitration. This, of course, will not help him pay his current monthly expenses.

When performing a google search for "Brant Cherne", at least five of the first few searches reveal the instant legal proceeding which will make it difficult to obtain a comparable sales job as prospective employers will learn about this litigation and be dissuaded from employing Cherne. *Id.* ¶ 15. Moreover, many prospective employers in the sales industry will inquire about whether Cherne is bound by any employment agreements, which will require him to reveal the Agreement with Hercules and his employment agreement with NDC also likely resulting in his inability to obtain a comparable sales job. *Id.* ¶ 16. Indeed, two prospective employers have inquired with Cherne about whether he is bound by a non-compete provision and why he is seeking employment which caused Cherne to disclose the existence of the litigation Hercules commenced against him which resulted in the prospective employers rejecting his candidacy. *Id.* A concern prospective employers will have, among others, is that Cherne would leave and return to NDC upon the expiration of the one year non-compete period. *Id.* ¶ 17.

Cherne's inability to support his family has caused him substantial emotional distress and has exacerbated his previously diagnosed obsessive-compulsive disorder and Guillame Barre syndrome. *Id.* ¶ 18.

By prohibiting Cherne from working in the pharmaceutical industry throughout the country for one year, the non-compete effectively devastates Cherne's ability to financially support his family, creating emotional and financial

hardship. Courts have held that this type of economic deprivation not only constitutes irreparable harm but also weighs heavily against enforcing such agreements. *See Carson*, 2020 U.S. Dist. LEXIS 48699; *Magtoles*, 2021 U.S. Dist. LEXIS 248070 at *19 (same); *Pella Windows & Doors v. Buscarnera*, 2007 U.S. Dist. LEXIS 52382 (E.D.N.Y. 2007) (same); *DS Parent, Inc. v. Teich*, 2014 U.S. Dist. LEXIS 16116 (N.D.N.Y. 2014).

While Hercules has suggested that Cherne could simply learn a new skill set and begin a different career, this suggestion is impractical. Shifting to a new industry will result in a substantial pay cut, and Cherne will face the additional challenge of overcoming a gap in his resume when attempting to re-enter the pharmaceutical industry. Cherne would be forced to start a new career from scratch, suffering a drastic pay cut while also leaving a gap on his resume. This would hinder his ability to return to the pharmaceutical industry after the non-compete period ends, making the harm to his career long-lasting. In *Fisher v. Global Values, Inc.*, 2006 U.S. Dist. LEXIS 85029 (D. Vt. 2006), the court acknowledged that preventing an employee from working in their chosen field results in not only immediate financial harm but also lasting damage to their standing in the industry. This Court should similarly find here that the restriction on Cherne's ability to work within the pharmaceutical sector for a year throughout the U.S. constitutes irreparable harm.

**POINT III**

18

## THE ISSUANCE OF A STAY WILL NOT SUBSTANTIALLY INJURE HERCULES

Cherne has returned all of Hercules' information that was in his possession and has agreed to destroy those documents in his possession once the Court permits same. *See* Felsen Decl., Ex. C ¶¶ 79-81; Ex. D, ¶ 2. Therefore, the issuance of a stay will not substantially injure Hercules.

The District Court improperly relied on Cherne's contractual acknowledgment in the Agreement that Hercules would suffer irreparable harm without making an independent finding of irreparable harm based on specific facts. However, such contractual provisions do not entitle a party to a per se finding of irreparable harm without an independent assessment of the facts. *See Baker's Aid v. Hussman Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987). This reflects a clear judicial mandate to assess whether the specific facts of the case actually demonstrate irreparable injury.

The acknowledgement of irreparable harm in the Agreement must be viewed in the context of its execution. Cherne attempted to negotiate terms of the Agreement, but Hercules refused to make any changes. Ultimately, Cherne was presented with a "take-it-or-leave-it" proposition, forcing him to sign under the threat of termination. *See* Felsen Decl., Ex. C ¶ 9. Cherne's "admission" of

19

irreparable harm should be afforded no weight, as it was compelled under duress, not freely negotiated.

The District Court's reliance on *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 237 (S.D.N.Y. 2014) in finding that Hercules will be irreparably harmed is misplaced. In *Uni-World*, the defendant repeatedly demonstrated an intent to breach the restrictive covenants. Here, by contrast, Cherne has acted in good faith, returning all confidential information and agreeing to destroy any remaining documents. He has shown no intent or pattern of engaging in any future misappropriation of Hercules' information.

Furthermore, there is no evidence that Hercules has suffered any financial harm due to Cherne's conduct. Cherne has not used any of Hercules' information since he stopped working at Hercules. Moreover, as explained by NDC, the information that Cherne provided to Hercules many months ago is not only stale, but has never been used by NDC. *See* Felsen Decl., Ex. D, ¶¶ 3-8.

Since Cherne left Hercules, **the company has neither lost revenue nor identified any customers who have ceased doing business with it as a result of Cherne's actions**. *See* Felsen Decl., Ex. C, Ex. A. Tr. 48:14-17; 50:21-51:22; 53:18-54:4; 80:20-22; 96:21-23. Therefore, any claim that allowing Cherne to continue working for NDC would cause irreparable harm is speculative and unsupported by the record.

Accordingly, Hercules will not suffer substantial injury if this Court grants a stay and allows Cherne to return to work for NDC pending the resolution of the appeal.

## POINT IV

### THE PUBLIC HAS A STRONG INTEREST IN ALLOWING INDIVIDUALS TO WORK AND SUPPORT THEIR FAMILIES

Cherne is now left without a job in the entire pharmaceutical industry for the next ten months during which time he will be unable to support his family. The public has an interest in ensuring that employees earn a livelihood to support their families and to support the economy. *See McManus*, 2021 U.S. Dist. LEXIS 80528 at *30 ("New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with the general public policy favoring robust and uninhibited competition, and powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.")

Not only does the enforcement of this non-compete provision conflict with this public interest, but it also raises fairness and moral concerns. Preventing an individual from working in the industry in which they have built their career, particularly when they are supporting a family, is inequitable and harsh. The public has a vested interest in ensuring individuals can work and contribute to the economy, especially in times of economic uncertainty.

Basic fairness and morality demand that the Court reject these inequitable restrictions, especially given the absence of any compelling harm to Hercules. The public interest, as highlighted by the courts, weighs strongly in favor of granting the stay, thereby allowing Cherne to continue earning a livelihood and supporting his family. At NDC, Cherne would be working in a completely different role than he did while he was as a Hercules employee.

## POINT V

### THE APPEAL SHOULD BE EXPEDITED BECAUSE CHERNE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF RELIEF

As set forth above, Cherne will suffer irreparable harm if a stay is not granted. As such, Cherne respectfully requests that the appeal be decided on an expedited basis.

## CONCLUSION

For these reasons, Defendant-Appellant respectfully requests that the Court grant its motion for a stay.

Dated: Lake Success, NY
      October 15, 2024

**MILMAN LABUDA LAW GROUP PLLC**

_____/s/_____
Jamie S. Felsen, Esq.
Michael J. Mauro, Esq.
3000 Marcus Ave., Suite 3W8
Lake Success, NY 11042
(516) 328-8899

UNITED STATES COURT OF APPEALS
SECOND CIRCUIT
-------------------------------------------------------------------X
HERCULES PHARMACEUTICALS, INC.,

                                    Case No.: 24-2545

        **Plaintiff-Appellee,**


    - against -

BRANT CHERNE,

        **Defendant-Appellant.**
-------------------------------------------------------------------X

## DECLARATION OF BRANT CHERNE IN SUPPORT OF HIS EMERGENCY MOTION FOR A STAY AND EXPEDITED APPEAL

    **BRANT CHERNE**, declares, pursuant to 28 U.S.C. § 1746, and under the penalties of perjury, that the following is true and correct:

    1.     I respectfully submit this Declaration, pursuant to Fed. R. App. P. 27 and Local Rule 27.1, in support of my Motion for a Stay of the District Court's Order prohibiting me from working for NDC Distributors ("NDC"), or within the entire pharmaceutical industry throughout the United States, until no earlier than August 1, 2025, and for an expedited appeal.

    2.     If I am prohibited from working for NDC or anywhere else in the pharmaceutical industry, I will be unable to support my wife, who is pregnant, and my two daughters, who are 3 ½ and 2 years of age.

    3.     My family relied on my substantial income when I worked for Plaintiff-Appellee Hercules Pharmaceuticals, Inc. ("Hercules"), and then when I left Hercules to work for NDC, to pay for an overwhelming majority of our substantial household expenses. I was responsible for approximately 90% of our family income while employed.

1

4. My family incurs approximately $20,000 in monthly expenses. Annexed hereto as **Exhibit "A"** is a summary of monthly expenses.

5. Because of the District Court's Order prohibiting me from working for NDC, NDC has ceased paying me.

6. Therefore, my family's only source of income is from my wife, whose monthly net income is $4,000. This will not come remotely close to paying our $20,000 monthly expenses.

7. Although my wife and I have approximately $90,000 in our savings account, we owe $80,000 to the IRS.

8. I am unable to borrow money from my family to cover our monthly expenses. My parents are 70+ years of age and still work, and my in-laws are 75+ years of age and still work. Both sets of parents are still working so that they can support themselves.

9. Because I am not working and I am embroiled in this litigation, I cannot obtain a loan from a bank to pay my family's monthly expenses.

10. Although NDC is contractually obligated to indemnify me from all litigation with Hercules, if NDC stops paying my legal bills and my arbitration fees (I am responsible for 50% of the arbitration fees pursuant to the arbitration agreement), which is possible as NDC has stopped paying my salary, I will be placed in further financial peril.

11. I have applied to approximately sixty (60) jobs without any success.

12. It has been extremely difficult for me to find sales jobs for which I am qualified that would compensate me comparably to what I earned at Hercules, or the reduced salary of $425,000 I accepted with NDC.

13. At NDC, my position would be exclusively in a manufacturing relations role, i.e., manufacturer facing buying products, rather than selling products, which I did at Hercules.

14.     Although I earned approximately $680,000 at Hercules in 2023, I earned $127,000 in each of the first two years that I worked at Hercules while I learned the industry, and my income increased each year thereafter as a result of being a commissioned employee and selling more products for Hercules. Having to obtain a sales job outside of the pharmaceutical industry would require me to start from scratch again, learning a new industry with a substantially lower salary - likely somewhere close to what I was paid when I started out at Hercules almost seven years ago.

15.     When performing a google search for "Brant Cherne", at least five of the first few searches reveal the instant legal proceeding, which will make it difficult to obtain a comparable sales job because, upon a simple google search of my name, prospective employers will learn about this litigation and be dissuaded from employing me.

16.     Many prospective employers in the sales industry will inquire about whether I am bound by any employment agreements, which will require me to reveal my agreement with Hercules and my employment agreement with NDC, also likely resulting in my inability to obtain a comparable sales job.  In fact, two of the companies I have applied for jobs with have inquired about this.  For example, Solace Health, a concierge physician practice, asked me about whether I am bound by a non-compete agreement and why I am looking for employment.  In response, I disclosed the existence of the legal proceeding Hercules commenced against me, and Solace Health responded that it is not going to move forward with my candidacy because I am in litigation. Similarly, I interviewed with a company called Murano Connect, during which time I also disclosed the existence of my litigation with Hercules in response to their inquiries and they also said they would not proceed with my candidacy since I am in litigation.

17.     A concern prospective employers will have, among others, is that I may leave and return to NDC upon the expiration of the one year non-compete period on August 1, 2025.

3

18.    My inability to support my family has caused me substantial emotional distress and has exacerbated my previously diagnosed obsessive-compulsive disorder, and enflamed the nerve damage within my body due Guillame Barre syndrome.

19.    I respectfully submit that, based on the foregoing, prohibiting me from working for NDC or in the pharmaceutical industry while my appeal is pending will cause me significant and irreparable harm.

Dated: Lake Success, New York
          October 15, 2024

Brant Cherne

# EXHIBIT "A"



ROCKET Money

Hi, Brant
Premium Member

- Dashboard
- Recurring
- Spending
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."
C.S. Lewis

Chat with us

SPENDING BREAKDOWN

You spent $4,253 more this month due to increases in Family Care (up by $900), Auto & Transport (up by $732) and Education (up by $299).

Include bills

| Category | % Spend | Change | Amount |
|---|---|---|---|
| Family Care | 15% of spend | ↑ 20% | $5,500.00 |

NEEDS CATEGORIZATION

Update 4 transactions

SUMMARY Sep 1 - Sep 30

| | |
|---|---|
| Income<br>3 income events | +$20,238.61 |
| Bills<br>13% of your income | $2,704.32 |
| Spending<br>$2.58k more than Aug | $33,127.50 |
| Left for Savings<br>You spent 77% more than you earned | -$15,593.21 |

FREQUENT SPEND

You've spent at Uber 29 times this month vs. 42 times last month.

| | | |
|---|---|---|
| 29x | Uber<br>Average $34.63 | $1,004.39 |

**ROCKET** Money

Hi, Brant
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to
set another goal or to
dream a new dream."
C.S. Lewis

- Chat with us

app.rocketmoney.com/spending?period=month&startDate=2024-09-01

| Category | % Spend | Change ⓘ | Amount |
|---|---|---|---|
| ♥ Family Care | 15% of spend | ↑ 20% | $5,500.00 |
| ⏰ Rent | 15% of spend | | $5,200.00 |
| 🚗 Auto & Transport | 10% of spend | ↑ 27% | $3,464.74 |
| 🏫 Education | 8% of spend | ↑ 12% | $2,802.83 |
| 📘 Bills & Utilities | 8% of spend | ↑ 163% | $2,704.32 |
| ⏰ Kids Activities | 6% of spend | | $2,195.23 |
| ⏰ Home Supplies | 6% of spend | ↑ 68% | $2,000.00 |
| 🛒 Groceries | 5% of spend | ↑ 7% | $1,755.78 |
| 🍴 Dining & Drinks | 5% of spend | ↓ 41% | $1,734.24 |
| ⏰ Mobile Phone | 5% of spend | | $1,696.42 |
| ⏰ Baby Supplies | 5% of spend | ↓ 29% | $1,623.88 |
| 🏦 Loan Payment | 4% of spend | ↑ 49% | $1,557.31 |

| | | |
|---|---|---|
| 29x | **Uber** Average $34.63 | $1,004.39 |
| 19x | **Doordash** Average $14.17 | $269.25 |
| 15x | **Target** Average $65.65 | $984.72 |

See more

**LARGEST PURCHASES**

Your top 3 expenses accounted for 13% of your
spend this month.

| | | |
|---|---|---|
| ⏰ | **Pierce Country Day** September 4 | $2,060.00 |
| 🏦 | **The Community Synag...** September 27 | $1,442.00 |

app.rocketmoney.com/spending?period=month&startDate=2024-09-01

# ROCKET Money

**Hi, Brant**
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."
C.S. Lewis

Chat with us

| | | | |
|---|---|---|---|
| Loan Payment | 4% of spend | ↑ 49% | $1,557.31 |
| Ride Service | 3% of spend | ↓ 48% | $1,004.39 |
| Entertainment & Rec. | 2% of spend | ↓ 23% | $706.43 |
| Medical | 2% of spend | ↑ 21% | $558.31 |
| Fees | 1% of spend | ↓ 68% | $286.37 |
| Cash & Checks | 1% of spend | ↑ 35% | $243.00 |
| Recurring Subscriptions | 1% of spend | ↑ 13% | $242.26 |
| Uncategorized | 1% of spend | ↑ 313% | $217.45 |
| Software & Tech | < 1% of spend | | $140.03 |
| Pets | < 1% of spend | ↓ 20% | $120.00 |
| Health & Wellness | < 1% of spend | ↓ 78% | $53.04 |
| Shopping | < 1% of spend | ↓ 96% | $19.27 |
| Home & Garden | < 1% of spend | ↓ 61% | $6.52 |

ROCKET Money

Hi, Brant
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to
set another goal or to
dream a new dream."
C.S. Lewis

Chat with us

| | | | |
|---|---|---|---|
| 🛍️ Shopping | < 1% of spend | ↓ 96% | $19.27 |
| 🏡 Home & Garden | < 1% of spend | ↓ 61% | $6.52 |

**NON-SPENDING**

| | |
|---|---|
| 📗 Tax Deductible | $0 |
| ↩️ Reimbursements | $0 |
| ⊖ Ignored | $21.22 |
| ↻ Internal Transfers | 5 |

### Data not looking right?

It's important to us that we get your data right so you have an accurate view of your money.

Learn how to adjust your data     Report a problem with your data

© 2024 Rocket Money. All rights reserved.     Terms of Service     Privacy Policy     Notice at Collection     Do Not Sell or Share My Personal Information

app.rocketmoney.com

# ROCKET Money

**Hi, Brant**
Premium Member

- Dashboard
- Recurring
- Spending
- Budgets
- Net Worth
- Transactions
- Credit Score

*"You are never too old to set another goal or to dream a new dream."*
C.S. Lewis

Chat with us

# Good morning, Brant

Current spend this month

## $12,007

✓ You've spent $3,498 less than last month

$35.8k
$27k
$18.1k
$9.26k

Payday in 8 days

### RECENT TRANSACTIONS

You've had 91 transactions so far this month

| Date | Name | | Amount | |
|------|------|--|--------|--|
| 10/8 | Lovevery \| Pending | 🛍️ | $130.35 | › |
| 10/8 | Amazon Purchase \| Pending | 🐷 | $19.54 | › |
| 10/8 | Amazon Purchase \| Pending | 🐷 | $10.85 | › |

### ACCOUNTS

⟳ 18 hours ago | <u>Sync now</u>

| 🏦 Checking | $64,231 ⌄ |
|---|---|
| 💳 Credit Cards | $7,384 ⌄ |
| 💳 Net Cash | $56,848 ⓘ |
| 🎒 Savings | Add + |
| 📊 Investments | $26,245 ⌄ |

### COMING UP

You have 12 recurring charges due within the next 10 days for $25,032.95.

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| 6 | 7 | 8 | **9** | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |

app.rocketmoney.com/spending

# ROCKET Money

**Hi, Brant**
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."
C.S. Lewis

Chat with us



SPENDING BREAKDOWN

Include bills

TOTAL SPEND
**$12,006.51**
↓ 64% from Sep

| Category | % Spend | Change ⓘ | Amount |
|----------|---------|----------|--------|
| 🐷 Rent | 43% of spend | | $5,200.00 |
| 💳 Loan Payment | 10% of spend | ↓ 24% | $1,179.36 |
| 🛒 Groceries | 8% of spend | ↓ 47% | $937.91 |

**NEEDS CATEGORIZATION**

✏️ Update 1 transactions  ›

**SUMMARY**                                Oct 1 – Oct 9

⊕ **Income**                              +$2,932.74
Next payday in 8 days

⊖ **Bills**                               $446.00
$2.26k less than Sep

⊖ **Spending**                            $11,560.51
$19.5k less than Sep

**FREQUENT SPEND**

You've spent at Target 10 times this month vs. 13 times last month.

10x **Target**                            $388.69
Average $38.87

8x **Doordash**                           $80.61
Average $10.08

app.rocketmoney.com/spending

ROCKET Money

**Hi, Brant**
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."
C.S. Lewis

Chat with us

| Category | % Spend | Change ⓘ | Amount |
|---|---|---|---|
| Rent | 43% of spend | | $5,200.00 |
| Loan Payment | 10% of spend | ↓ 24% | $1,179.36 |
| Groceries | 8% of spend | ↓ 47% | $937.91 |
| Family Care | 7% of spend | ↓ 80% | $900.00 |
| Baby Supplies | 6% of spend | ↓ 55% | $730.50 |
| Shopping | 5% of spend | ↑ 3941% | $657.80 |
| Dining & Drinks | 5% of spend | ↓ 68% | $556.79 |
| Entertainment & Rec. | 4% of spend | ↓ 36% | $452.82 |
| Bills & Utilities | 4% of spend | ↓ 84% | $446.00 |
| Home Supplies | 3% of spend | ↓ 75% | $360.00 |
| Auto & Transport | 1% of spend | ↓ 96% | $152.38 |
| Kids Activities | 1% of spend | ↓ 94% | $120.00 |

**Target**
10x  Average $38.87  $388.69

**Doordash**
8x  Average $10.08  $80.61

**Amazon Marketplace Na**
7x  Average $34.66  $242.61

See more

LARGEST PURCHASES

Your top 3 expenses accounted for 16% of your spend this month.

**Best Egg**
October 3  $667.18

**Freshdirect.com Cate866...**
October 2  $364.69

app.rocketmoney.com/spending

# ROCKET Money

**Hi, Brant**
Premium Member

- Dashboard
- Recurring
- **Spending**
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."

C.S. Lewis

Chat with us

| | | | | |
|---|---|---|---|---|
| 🚗 Auto & Transport | 1% of spend | ↓ 96% | | $152.38 |
| 🐷 Kids Activities | 1% of spend | ↓ 94% | | $120.00 |
| ❓ Uncategorized | 1% of spend | ↓ 54% | | $100.00 |
| 🟡 Recurring Subscriptions | 1% of spend | ↓ 62% | | $79.81 |
| 💙 Health & Wellness | < 1% of spend | ↑ 5% | | $55.92 |
| ➕ Medical | < 1% of spend | ↓ 92% | | $45.01 |
| 🚫 Fees | < 1% of spend | ↓ 86% | | $32.21 |

**NON-SPENDING**

| | |
|---|---|
| 📗 Tax Deductible | $0 |
| 🔁 Reimbursements | $0 |
| ⊖ Ignored | +$1.99 |
| ↻ Internal Transfers | 0 |

| | | |
|---|---|---|
| 📷 | October 3 | $667.18 |
| 🛒 Freshdirect.com Cate866... | October 2 | $364.69 |

See more



app.rocketmoney.com/net-worth?tab=assets

ROCKET Money

Hi, Brant
Premium Member

- Dashboard
- Recurring
- Spending
- Budgets
- Net Worth
- Transactions
- Credit Score

"You are never too old to set another goal or to dream a new dream."
C.S. Lewis

Chat with us

# Net Worth

Preferences | Add Account

Summary | Assets | Debt

Total assets value
## $90,477

Up $90,477 over the last 6 months

1M | 3M | 6M | 1Y | ALL

CASH

Your cash has remained about the same this month

| 2 Accounts | Balance |
|---|---|
| Adv Relationship Banking<br>Bank of America | $0 |
| SAPPHIRE CHECKING<br>Chase | $64.2k |

SUMMARY

This is how your net worth is calculated. Make sure all of your accounts are connected for an accurate summary.

| | |
|---|---|
| Assets<br>5 accounts | $90,477 |
| Debts<br>4 accounts | $7,384 |
| Net Worth<br>Assets - Debts | $83,093 |

**UNITED STATES COURT OF APPEALS**
**SECOND CIRCUIT**
-----------------------------------------------------------------X

**HERCULES PHARMACEUTICALS, INC.,**

        **Plaintiff-Appellee,**

        **Case No.: 24-2545**

        **- against -**

**BRANT CHERNE,**

        **Defendant-Appellant.**

-----------------------------------------------------------------X

**DECLARATION OF JAMIE S. FELSEN IN SUPPORT OF DEFENDANT-APPELLANT BRANT CHERNE'S EMERGENCY MOTION FOR A STAY AND EXPEDITED APPEAL**

        **JAMIE S. FELSEN, ESQ.**, declares, pursuant to 28 U.S.C. § 1746, and under the penalties of perjury, that the following is true and correct:

        1.     I am admitted to practice before this Court. I am a member of Milman Labuda Law Group PLLC ("MLLG"), attorneys for Defendant-Appellant Brant Cherne ("Appellant" or "Cherne") in this action. I respectfully submit this Declaration, pursuant to Fed. R. App. Pro. Rules 8 and 27 and Local Rule 27.1, in support of Appellant's Motion for a Stay and Expedited Appeal.

        2.     Prior to filing this motion, Cherne filed a motion for a stay with the District Court, which motion was denied by the District Court on October 1, 2024. A copy of the Order is annexed hereto as **Exhibit "A"**.

        3.     Annexed hereto as **Exhibit "B"** is a true and accurate copy of the Employee Confidentiality and Non-Compete Agreement between the parties.

        4.     Annexed hereto as **Exhibit "C"** (filed under seal and submitted in hard copy to this Court) is a true and accurate copy of Cherne's September 10, 2024 Declaration in Opposition to Plaintiff-Appellee Hercules Pharmaceuticals, Inc.'s ("Appellee" or "Hercules") TRO and

preliminary injunction, with exhibits, including the transcript from the August 16, 2024 hearing in the District Court on Hercules' order to show cause regarding the TRO and preliminary injunction, which were filed under seal in the District Court.

5.     Attached hereto as **Exhibit "D"** is a true and accurate copy of Issac Rosen's September 12, 2024 declaration.

Dated: Lake Success, New York
          October 15, 2024

<div align="right">

/s/ Jamie S. Felsen, Esq.
Jamie S. Felsen, Esq.

</div>

# EXHIBIT "A"

Civil Proceeding Minute Entry (rev. 9/24 (elr))                                                    Page 1 of 5

# UNITED STATES DISTRICT COURT
## Eastern District of New York

| | |
|---|---|
| Hercules Pharmaceuticals, Inc. | Presiding Judge: **Joanna Seybert, Senior U.S.D.J.** |
| - v - | Case No(s).: **24-cv-5659-JS-AYS** |
| Cherne | Date: **10/1/2024** |
| | Start Time: **1:18 PM**   Total Time: 1 hr. 20 mins. |

### MINUTE ENTRY FOR A CIVIL PROCEEDING

### SEALED PROCEEDING: ☐ Yes ☑ No

## I. APPEARANCES:

Plaintiff _____ : Hercules Pharmaceuticals, Inc. _____

     Represented by : **Richard Schoenstein, and Brittany Lazzaro** _____

Defendant _____ : Brant Cherne _____

     Represented by : **Jamie Felsen, Michael Mauro, and Robert Milman** _____

_____ : _____

     Represented by : _____

_____ : _____

     Represented by : _____

_____ : _____

     Represented by : _____

_____ : _____

     Represented by : _____

_____ : _____

     Represented by : _____

_____ : _____

     Represented by : _____

Other Appearances: _____

                           _____

                           _____

Court Reporter(s): **Paul Lombardi** _____

                           _____

FTR Time(s): _____

Courtroom Deputy: Eric L. Russo _____

## II. PROCEEDINGS HELD:

☑ In-Person    ☐ Bench Trial (*see pg. 3*)    ☐ Jury Selection (*see pg. 3*)    ☐ Pre-Trial Conference (*see pg. 2*)
☐ By Telephone   ☐ Contempt Hearing (*see pg. 2*)   ☐ Jury Trial (*see pg. 3*)    ☐ Settlement Conference (*see pg. 2*)
☐ By Video     ☐ Evidentiary Hearing (*see pg. 2*)   ☑ Motion Hearing (*see pg. 2*)   ☐ Show Cause Hearing (*see pg. 2*)
            ☐ Fairness Hearing (*see pg. 2*)    ☐ Preliminary Injunction Hearing (*see pg. 2*)   ☐ Status Conference (*see pg. 2*)
            ☐ Jury Deliberation (*see pg. 3*)   ☐ Pre-Motion Conference (*see pg. 2*)

☐ Other Proceeding: _____

Civil Proceeding Minute Entry (rev. 9/24 (elr))                                                                                     Page 2 of 5

## III. SUMMARY OF THE PROCEEDINGS:

☑  Motion Hearing _____ held.
   - ☑  Hearing held regarding the defendant's Motion for Temporary Restraining Order (see DE 39) and Motion to Unseal (see DE 43) _____.
   - ☑  The parties presented their oral arguments to the Court.
   - ☐  Witness(es) were called for the: ☐ _____; ☐ _____; ☐ _____.
   - ☐  Exhibits were entered into evidence.
   - ☑  The Court made the following ruling(s):
     - ☑  GRANTED as to the defendant's Motion to Unseal _____.
     - ☑  DENIED as to the defendant's Motion for Temporary Restraining Order _____.
     - ☐  GRANTED, in part, as to _____.
     - ☐  Found MOOT as to _____.
     - ☐  Decision RESERVED as to _____.
   - ☑  The Court's decision: ☑ was entered on the record; ☐ will be entered under a separate order.
   - ☑  See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐  _____ held.
   - ☐  The parties advised the Court of the status of the case.
   - ☐  The parties presented their oral arguments to the Court regarding the proposed motion(s).
   - ☐  The following briefing schedule was set:
     - ☐  _____ shall serve the motion and all supporting papers by _____.
     - ☐  _____ shall serve the opposition to the motion and all supporting papers by _____.
     - ☐  _____ shall serve the cross-motion and all supporting papers by _____.
     - ☐  _____ shall serve the reply and all supporting papers by _____.
     - ☐  _____ shall serve the opposition to the cross motion and all supporting papers by _____.
     - ☐  _____ shall serve the reply to the cross motion and all supporting papers by _____.
     - ☐  The parties are directed to file their motion papers in accordance with the Court's Individual Rules regarding BUNDLING (see Rule III).
     - ☐  The Court will not grant any extensions of the deadlines set forth above.
   - ☐  The parties were directed to file a proposed briefing schedule on or before _____.
   - ☐  The Court deemed, or previously deemed, this case TRIAL READY.
     - ☐  The Court set the following pre-trial submission schedule:
       - ☐  Motion(s) in Limine and all supporting papers shall be filed by _____.
       - ☐  Opposition(s) to Motions in Limine and all supporting papers shall be filed by _____.
       - ☐  Reply(ies) to Motions in Limine and all supporting papers shall be filed by _____.
       - ☐  Proposed voir dire questions and a brief case summary shall be filed by _____.
       - ☐  Proposed exhibits and a witness list shall be filed by _____.
       - ☐  Proposed jury charge and verdict sheet shall be filed by _____.
       - ☐  The Court will not grant any extensions of the deadlines set forth above.
       - ☐  The parties are directed to submit courtesy copies of their submissions in accordance with the Court's Individual Rules (see Rule IV).
       - ☐  The parties are directed to e-mail copies of the proposed case summary, voir dire questions, witness list, jury charge, and verdict sheets in Word format to the Chambers e-mail at "Seybert_Chambers@nyed.uscourts.gov".
     - ☐  The parties were directed to file a proposed pre-trial submission schedule on or before _____.
     - ☐  The Court will enter a separate order outlining the pre-trial submission schedule.
   - ☐  See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐  Fairness Hearing/Settlement Conference held.
   - ☐  The parties outlined the details of the settlement agreement.
   - ☐  No party(ies) appeared opposing the settlement.
   - ☐  Objections to the proposed settlement were heard.
   - ☐  The Court made the following ruling(s):
     - ☐  GRANTED as to the: ☐ Motion for Settlement Approval; ☐ Motion for Attorney Fees.
     - ☐  DENIED as to the: ☐ Motion for Settlement Approval; ☐ Motion for Attorney Fees.
     - ☐  GRANTED, in part, as to the: ☐ Motion for Settlement Approval; ☐ Motion for Attorney Fees.
     - ☐  Found MOOT as to the: ☐ Motion for Settlement Approval; ☐ Motion for Attorney Fees.
     - ☐  Decision RESERVED as to the: ☐ Motion for Settlement Approval; ☐ Motion for Attorney Fees.
   - ☐  The Court's decision: ☐ was entered on the record; ☐ will be entered under a separate order.
   - ☐  See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐ Bench Trial held.
    ☐ Opening statements heard from: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Opening statements waived by: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Witness(es) were called for: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Exhibits were entered into evidence.
    ☐ _____ rests.
    ☐ _____ rests.
    ☐ _____ rests.
    ☐ Summations were heard from: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Summations waived by: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ The Court set the following post-trial submission schedule:
        ☐ _____ shall file proposed Findings of Fact and Conclusions of Law by _____.
        ☐ _____ shall file proposed Findings of Fact and Conclusions of Law by _____.
        ☐ _____ shall file proposed Findings of Fact and Conclusions of Law by _____.
        ☐ _____ shall file proposed Findings of Fact and Conclusions of Law by _____.
    ☐ The Court's decision: ☐ was RESERVED; ☐ was entered on the record; ☐ will be entered under a separate order.
    ☐ See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐ Jury Selection/Voir Dire held.
    ☐ The prospective jurors were sworn and given preliminary instructions by the Court.
    ☐ The prospective jurors were asked questions touching upon their qualifications to serve as jurors.
    ☐ A jury of _____ were selected and are satisfactory to all parties.
    ☐ See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐ Jury Trial held.
    ☐ A jury of _____, previously selected by _____, are satisfactory to all parties.
    ☐ The selected jurors were sworn as trial jurors.
    ☐ The jurors were given preliminary instructions by the Court.
    ☐ Opening statements heard from the: ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Witness(es) were called for the: ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Exhibits were entered into evidence.
    ☐ _____ rests.
    ☐ _____ rests.
    ☐ _____ rests.
    ☐ A Charge Conference was held with the Court and counsel.
    ☐ Summations were heard from: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ Summations waived by: ☐ all parties; ☐ the _____; ☐ the _____; ☐ the _____.
    ☐ The Court charged the jury.
    ☐ See Section V and/or VI (*page 5*) for additional details and/or rulings.

☐ Jury Deliberation held.
    ☐ Jury Notes were received and marked as Court Exhibits.
    ☐ The Court instructed the jury to continue their deliberations pursuant to Allen v. United States (*Allen Charge*).
    ☐ The jury rendered their verdict.
    ☐ The jurors were polled as to their verdict.
    ☐ The Verdict Sheet was received and marked as a Court Exhibit.
    ☐ The jurors were excused with the thanks of the Court.
    ☐ See Section V and/or VI (*page 5*) for additional details and/or rulings.

## IV. FURTHER PROCEEDINGS SET:

☑ No further proceedings have been set at this time.

☐ Bench Trial is set for _____ at _____ before _____, _____.

☐ Contempt Hearing is set for _____ at _____ before _____, _____.

☐ Evidentiary Hearing is set for _____ at _____ before _____, _____.

☐ Fairness Hearing is set for _____ at _____ before _____, _____.

☐ Jury Deliberation is set for/shall continue on _____ at _____.

☐ Jury Selection is set for _____ at _____ before _____, _____.

☐ Jury Trial is set for _____ at _____ before _____, _____.

☐ Motion Hearing is set for _____ at _____ before _____, _____.

☐ Preliminary Injunction Hearing is set for _____ at _____ before _____, _____.

☐ Pre-Motion Conference is set for _____ at _____ before _____, _____.

☐ Pre-Trial Conference is set for _____ at _____ before _____, _____.

☐ Settlement Conference is set for _____ at _____ before _____, _____.

☐ Show Cause Hearing is set for _____ at _____ before _____, _____.

☐ Status Conference is set for _____ at _____ before _____, _____.

☐ The Court ordered the proceeding(s) above to be held via the Court's teleconferencing system. Parties are directed to dial the following telephone number at the designated time: **877-336-1839, access code 7231185**.

☐ The Court ordered the proceeding(s) above to be held by video, via **ZoomGov**. The parties on the case will be sent a separate notice by the Courtroom Deputy with instructions on how to log into the video meeting as the scheduled date approaches.

☐ See Section V and/or VI (*page 5*) for additional details regarding the proceeding(s) set.

**** INTENTIONALLY LEFT BLANK ****

Civil Proceeding Minute Entry (rev. 9/24 (elr))                                                                                   Page 5 of 5

## V. OTHER RULINGS MADE DURING THE PROCEEDINGS:

☐   **The record of this proceeding was deemed SEALED**. Transcripts of this proceeding can be made available to the Court, the defendant(s), defense counsel, and the Government **ONLY**. Any other non-party must file a written request to the Court for permission to receive a copy of the transcripts.

☑   The Court made the following rulings:

> - For the reasons stated on the record, the defendant's letter dated 9/26/2024 (see DE 43) shall be considered, and re-classified, as a Motion to Unseal and that motion is granted for the sole purpose of allowing defense counsel to obtain copies of the requested documents from the Clerk's Office.

## VI. ADDITIONAL RULINGS:

☐   The Court makes the following additional rulings (*not addressed during the proceedings*):

# EXHIBIT "B"

# Exhibit 2

**EMPLOYEE CONFIDENTIALITY AND NON-COMPETE AGREEMENT**

This EMPLOYEE CONFIDENTIALITY AND NON-COMPETE ("Agreement") is entered into by and between Hercules Pharmaceuticals, Inc., a New York corporation, with its principal place of business located at 27 Seaview Boulevard, Port Washington, New York 11050, (the "Employer") and Brant Cherne (the "Employee") (the Employer and the Employee are collectively referred to herein as the "Parties") as of July 11, 2018 (the "Effective Date").

WHEREAS, the Employee has accepted at-will employment with the Employer.

WHEREAS, the Employee desires to give, and Employer desires to receive from Employee, certain promises and restrictive covenants in connection with Employee's employment; and

WHEREAS, the Employer and Employee desire to set forth in writing the terms and conditions of their agreements and understandings;

NOW, THEREFORE, in consideration of the Employee's employment and continued employment, which the Employee acknowledges to be good and valuable consideration for the Employee's obligations hereunder, the Parties hereto, intending legally to be bound, hereby agree as follows:

1. Scope of Employment

   a. Position and Duties. Employee is an employee of Employer with the title of Director of Business Development.  Employee further agrees that over the course of his employment, he shall use his reasonable best efforts and his skills and experiences in the best interests of Employer.  Employee's job duties, subject to Employer's  right to give specific direction, shall include, without limitation, the implementation of sales duties, that will include, but not be limited to, enabling members of the supply chain (including manufactuers, repackagers, wholesale distributors, dispensers, and third-party logistics providers) to attain Drug Supply Chain Security Act compliance in an efficient, interoperable, and secure manner and performing such operational duties as may be assigned to him from time to time by Employer.  Except as may be mutually agreed between Employer and Employee, Employee shall be based at Employer's headquarters located in Port Washington, New York except for when business needs require Employee to travel on a temporary basis.

   b. Exclusive Efforts. During Employee's employment by Employer, Employee shall render services to Employer exclusively, and shall not render, directly or indirectly, any services or engage in business activities, offered or in development by Employer at any time during Employee's employment by Employer, on behalf of any other person or entity, either as an employee, employer, consultant, agent, principal, partner, equityholder, corporate officer, director, or in any other individual or representative capacity, that is directly or indirectly competitive with or otherwise harmful to, any business or other activity then conducted by Employer, without the prior written consent of Employer. "Competitive" shall refer to any enterprise, activity, or business that competes with the Employer in any of its material businesses, including, without limitation, the Employer's compliance programs associated with community pharmacy and specialty pharmacy, as well as the Employer's wholesale distributor business.  Employee agrees to serve Employer faithfully, to execute to the reasonable best of his abilities the duties of his position, and to devote his entire business time, attention, and efforts to the interests and business of Employer.  Employee represents and warrants to Employer that he is not under any contractual commitment which prohibits or limits his employment by Employer or which is inconsistent with his duties as set forth in this Agreement.

   c. Compliance with Laws and Policies. Employee agrees at all times to comply in all material respects to all applicable laws, rules and regulations related to the business of the Employer and with the policies, procedures and practices of Employer in effect from time to time.

2. Confidential Information and Trade Secrets

   a. Acknowledgment of Confidential Information and Trade Secrets. The Employee understands and acknowledges the following:

      (i)     During the course of employment, the Employee will have access to and learn about the Employer's confidential, proprietary, and trade secret information.

      (ii)    Employer has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, generating customer and potential customer lists, developing compliance programs, training its employees, marketing and improving its business, developing pricing lists for its products, and selling products and/or services. As a result of these efforts, Employer has created, and continues to use and create, Confidential Information and trade secrets, as defined herein. The Employee understands and acknowledges that the Employer invested significant time and expense in developing the Confidential Information, trade secrets and goodwill.

(iii)        The Confidential Information and trade secrets provide Employer with a competitive advantage over others in the marketplace and that Employer would suffer irreparable harm if Confidential Information and trade secrets are disclosed to its community pharmacy, speciality pharmacy and wholesale distributor competitors.

(iv)        The nature of the Employee's position gives the Employee access to and knowledge of Confidential Information and trade secrets and places the Employee in a position of trust and confidence with the Employer and that the Employee will benefit from the Employer's goodwill.

(v)        The restrictive covenants herein are necessary to protect the Employer's legitimate business interests in its Confidential Information, trade secrets and goodwill.  The Employer's ability to reserve these for the exclusive knowledge and use of the Employer is of great competitive importance and commercial value to the Employer and that the Employer would be irreparably harmed if the Employee violates the restrictive covenants in this Agreement.

b.      <u>Confidential Information and Trade Secrets Defined</u>.

(i)        For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic, or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, and client information of the Employer or its businesses or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to the Employer in confidence.

(ii)        Trade secrets are defined as information of Employer, including, but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that pertains to the Employer's compliance program, pricing and customer lists that: (1) derives independent economic value, actually or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(iii)        The Employee understands that the above list is not exhaustive, and that Confidential Information and trade secrets also include other information, whether or not it is marked as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

(iv)        The Employee understands and agrees that Confidential Information and trade secrets include information developed by the Employee during the employment, as if the Employer furnished the same Confidential Information and trade secrets to the Employee in the first instance.

(v)        Confidential Information and trade secrets shall not include information that is generally available to and known by the public at the time of disclosure to the Employee, provided that such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

3.     <u>Restrictive Covenants</u>.

a.      <u>Non-Disclosure and Use Restrictions</u>.

i.        The Employee agrees and covenants: (A) to treat all Confidential Information and trade secrets as strictly confidential; (B) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information and trade secrets, or allow them to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Employer) not having a need to know and authority to know and use the Confidential Information and trade secrets in connection with the business of the Employer; (C) to store all documents, records, files, media, or other resources containing any Confidential Information and trade secrets on technology issued by the Employer only; (D) not to use any non-Employer issued technology but to instead solely carry out responsibilities on technology issued by the Employer; (E) not to access or use any Confidential Information and trade secrets, and not to copy any documents, records, files, media, or other resources containing any Confidential Information and trade secrets, or remove any such documents, records, files, media, or other resources from the office premises or control of the Employer, except as required in the performance of the Employee's authorized employment duties; and (F) employee understands and acknowledges that this obligation applies not only to technical information and customer information, but also to any business information that Employer treats as confidential.

Employer agrees that all Confidential Information and trade secrets of Employer are to be used by him solely and exclusively for the purpose of conducting business on behalf of Employer. If Employee resigns or is terminated from his employment for any reason, he agrees to immediately return all Confidential Information and trade secrets maintained by him in his office and/or home, and separately use reasonable efforts to remove or destroy any Confidential Information and trade secrets maintained on personal electronic devices.

        ii.      Nothing herein shall be construed to prevent disclosure of Confidential Information and trade secrets as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. To the extent permitted by law, the Employee shall promptly provide written notice of any such order to the Employer to enable Employer to seek a protective order or otherwise prevent such disclosure.

        iii.     The Employee understands and acknowledges that the Employee's obligations under this Agreement with regard to any particular Confidential Information and trade secret shall commence immediately upon the Employee first having access to such Confidential Information and trade secrets (whether before or after beginning employment with the Employer) and shall continue during and after the Employee's employment until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with the Employee or on the Employee's behalf.

      b.     <u>Protected Activities and Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016, and/or Applicable State Law</u>. Notwithstanding any other provision of this Agreement:

        i.       The Employee will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made: (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (B) solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

        ii.      If the Employee files a lawsuit for retaliation by the Employer for reporting a suspected violation of law, the Employee may disclose the Employer's trade secrets to the Employee's attorney and use the trade secret information in the court proceeding if the Employee (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

      c.     <u>Non-Competition</u>.

        i.       Because of Employer's legitimate business interest as described herein and the good and valuable consideration, including the pharmaceutical industry knowledge, salary, and monetary benefits from employment, offered to the Employee, the receipt and sufficiency of which is acknowledged, during the term of Employee's employment and for the period beginning on the last day of the Employee's employment with the Employer and continuing for twelve (12) months thereafter, for any reason or no reason and whether employment is terminated at the option of the Employee or the Employer, the Employee agrees and covenants not to engage in any Prohibited Activity; provided, however, that with respect to trade secrets, the Employee shall hold and keep secret and confidential such trade secrets for so long as they remain trade secrets under applicable law. Employee acknowledges that he will have access to proprietary information as Director of Business Development and agrees that he will not use this information to engage in a Prohibited Activity.

        ii.      For purposes of this non-compete clause, "Prohibited Activity" is activity in which the Employee contributes their knowledge (whether directly or indirectly, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity) to an entity engaged in any business that competes with Employer, by selling any product or service sold by Employer. Prohibited Activity also includes activity that may require or inevitably require disclosure of Confidential Information.

        iii.     Nothing herein shall prohibit Employee from purchasing or owning less than five percent (5%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that the Employee is not a controlling person of, or a member of a group that controls, such corporation.

        iv.     This Section does not, in any way, restrict or impede the Employee (A) from exercising protected rights to the extent that such rights cannot be waived by agreement or (B) from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. To the extent permitted by law, the Employee shall promptly provide written notice of any such order to the Employer to enable Employer to seek a protective order or otherwise prevent such disclosure.

      d.     <u>Non-Solicitation of Employees</u>.

        i.      Employee understands and acknowledges that the Employer has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Employer. The Employee agrees and covenants not to directly or indirectly (A) solicit, hire, recruit, attempt to hire or recruit, any employee of the Employer in the twelve (12) months preceding the last day of Employee's employment, or (B) induce the termination of employment of any employee of the Employer during the period beginning on the last day of the Employee's employment with the Employer and continuing for twelve (12) months thereafter.

    e.    <u>Non-Solicitation of Customers</u>.

        i.      The Employee understands and acknowledges that the Employer has expended and continues to expend significant time and expense in developing customer relationships, customer information and goodwill, and that because of the Employee's experience with and relationship to the Employer, he will have access to and learn about much or all of the Employer's Customer Information (as defined herein). "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

        ii.      The Employee understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm to the Employer.

        iii.      The Employee agrees and covenants, during the period beginning on the last day of the Employee's employment with the Employer and continuing for twelve (12) months thereafter, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any form of communication, or meet with the Employer's current customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Employer. This restriction shall only apply to each of the following:

        1.    Customers or prospective customers the Employee contacted in any way during the twelve (12) months before the last day of the Employee's employment.

        2.    Customers about whom the Employee has trade secret or Confidential Information.

        3.    Customers who became customers during the Employee's employment.

        4.    Customers about whom the Employee has information that is not available publicly.

    f.    <u>Non-Disparagement</u>.

        i.      Neither the Employee nor any officer, director of the Employer, nor any spokesperson authorized by the Employer, shall, during Employee's employment or at any time thereafter, intentionally state or otherwise publish anything about the other party which would adversely affect the reputation, image or business relationships and goodwill of the other party in the market and community at large. Employee specifically agrees that during the Employee's employment and at all times thereafter Employee will not make statements or representations, or otherwise communicate, directly or indirectly, in writing, orally, or otherwise, or take any action which may, directly or indirectly, slander, disparage Employer or otherwise act in a fashion designed to injure the business of Employer or its affiliates or their respective current or former officers, directors, employees, advisors, businesses or reputations.

        ii.      During Employee's employment and at all times thereafter, the Employee shall fully cooperate with the Employer in defense of legal claims asserted against the Employer and other matters requiring the testimony or input and knowledge of the Employee. If at any time the Employee should be required to cooperate with the Employer pursuant to this Section, the Employer agrees to promptly reimburse the Employee for reasonable documented costs and expenses incurred as a result thereof.

        iii.      The Employee agrees that, during Employee's employment and at all times thereafter, the Employee will not speak or communicate with any party or representative of any party, who is known to the Employee to be either adverse to the Employer in litigation or administrative proceedings or to have threatened to commence litigation or administrative proceedings against the Employer, unless the Employee receives the written consent of the Employer to do so, or is otherwise compelled by law to do so, and then only after advance notice to the Employer to the extent permitted by law. Nothing herein shall prevent the Employee from pursuing any claim in connection with enforcing or defending the Employee's rights or obligations under this Agreement.

    g.    <u>Disclosure of Agreement</u>. Employee acknowledges and agrees that, during the twelve (12) months following the last day of the Employee's employment, Employee will disclose the existence and terms of this Agreement to any prospective employer, business partner, investor or lender prior to entering into an employment, partnership or other business relationship with such prospective employer, business partner, investor or lender. Employee further agrees that the Employer shall have the right to make any such prospective employer, business partner, investor or lender of Employee aware of the existence and terms of this Agreement.

    4.    <u>Acknowledgments.</u>

a. "At-Will" Employment Status. The Employee and Employer acknowledge that Employee's employment with the Employer is and shall remain "at-will". The Employee's employment with the Employer may be terminated at any time and for any reason or no reason by the Employer or the Employee. Neither this Agreement nor the language used herein are intended to create or constitute a contract of employment and shall not be construed as a commitment by either of the Parties to continue an employment relationship for any certain period of time.

b. Sufficient Consideration. Employee acknowledges and agrees that: (A) signing this Agreement is a condition of employment, and that employment or continued employment is sufficient consideration for signing this Agreement and compliance with the promises made herein; (B) the amount of the Employee's compensation reflects, in part, the Employee's obligations and the Employer's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and (C) the Employee will not be subject to undue hardship by reason of the Employee's full compliance with the terms and conditions of this Agreement or the Employer's enforcement thereof.

c. Eligibility. Employee represents and warrants that Employee has not been convicted of or have pleaded guilty to an offense involving fraud, corruption or immoral behavior, and is not currently being declared by any government agency to be excluded, suspended, proposed for suspension or exclusion, or otherwise ineligible for participation in public procurement programs or other public contracts.

d. Unique Services. The Employee acknowledges and agrees that (A) the Employee's services to be rendered to the Employer are of a special and unique character; (B) that the Employee will obtain knowledge and skill relevant to the Employer's industry, methods of doing business, and marketing strategies by virtue of the Employee's employment; (C) and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interests of the Employer.

e. Dismissal. Employee agrees that any breach by Employee of any of the covenants set forth in this Agreement during Employee's employment, shall be grounds for immediate dismissal of Employee and shall subject Employee to an action for monetary damages, which shall be in addition to and not exclusive of any and all other rights and remedies the Employer may have against Employee.

5. Survival of Covenants. The restrictive covenants in Section 2 of this Agreement shall survive the termination of Employee's employment with Employer and shall be enforceable and remain in effect for the restrictive time periods provided in this Agreement. The existence of any claim or cause of action of Employee against Employer whether or not based on this Agreement shall not constitute a defense to the enforcement by Employer of any promises and restrictive covenants set forth in this Agreement. If any enforcement remedy is sought by Employer pursuant to this Agreement, then the restrictive time periods provided in this Agreement shall be extended by one (1) day for each day Employee failed to comply with the restriction at issue.

6. Ownership of Work Product and Inventions.

a. Ownership. Employer shall own all rights to "Work Product" (as defined below) created by Employee. Employee hereby assigns to Employer all copyright, trademark, trade secrecy, and patent rights in the Work Product. Employee will take all action reasonably requested by Employer to transfer rights to the Work Product to Employer and to permit Employer to obtain copyright, trademark, patent, or similar protection for the Work Product in its own name in any jurisdiction. Employee hereby waives in whole any moral rights which he may have in any such Work Product or any part or parts thereof. Employee will discuss the status of the Work Product with his supervisor or the chief technical officer of Employer on a regular basis so that Employer can decide when to protect or establish its rights. If Employee makes any "Invention" (as defined below) during the Employment Term that Employee believes does not belong to Employer under this Agreement, then Employee will promptly notify his supervisor and will supply a written explanation of the reasons for such belief. Employee is not the owner of any invention as of the date hereof. Employee agrees that even if his employment is terminated by Employer, Employee shall at all times cooperate with Employer in the prosecution or defense of any lawsuit related to Employer activities in connection with any copyright of Employer.

b. Definitions. For purposes of this Agreement, the following terms shall have the following meanings:

(i) "Invention" means any invention, including, without limitation, information, inventions, contributions, improvements, ideas, or discoveries, whether patentable or copyrightable or not, and whether or not conceived or made during work hours.

(ii) "Work Product" means written materials created by Employee, Inventions made by Employee, programs, fixes, routines, inventions, ideas, designs, manuals, improvements, discoveries, processes, and any other results or properties of Employee's efforts whether produced alone or with others, (A) relating to Employer's actual or anticipated business, or (B) made or conceived during working hours or developed with the aid of Employer's personnel or assets.

DocuSign Envelope ID: E620A51F-24DC-43AA-A5A5-075D9771AD49

7. <u>Successors and Assigns</u>.

      a.    <u>Assignment by the Employer</u>. To the extent permitted by law, the Employer may assign this Agreement to any subsidiary or corporate affiliate, or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or substantially all of the business or assets of the Employer. This Agreement shall inure to the benefit of the Employer and its successors and assigns.

      b.    <u>No Assignment by the Employee</u>. The Employee may not assign this Agreement or any part thereof. Any purported assignment by the Employee shall be null and void from the initial date of purported assignment.

8.    <u>Warranty</u>. Employee represents and warrants that the Employee is not a party to any non-compete restrictive covenant or related contractual limitation that would interfere with or hinder the Employee's ability to undertake the obligations and expectations of employment with the Employer.

9.    <u>Remedies</u>. In the event of a breach or threatened breach by the Employee of any of the provisions of this Agreement, the Employee hereby agrees and acknowledges that the Employer will suffer immediate and irreparable injury, for which monetary damages will not be an adequate remedy. Employee agrees that it would be impossible to calculate Employer's damages from any breach of the covenants set forth in this Agreement. The Employee further acknowledges and agrees that the Employer shall be entitled to immediate injunctive relief, including a temporary restraining order, a temporary injunction, a permanent injunction, or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy. The Employee further agrees and acknowledges that the aforementioned equitable relief shall be in addition to, not in lieu of, and without prejudice to, any legal remedies, monetary damages, or other available forms of relief.

10.    <u>Governing Law, Jurisdiction and Venue</u>. This Agreement, for all purposes, shall be construed in accordance with the laws of New York without regard to conflicts-of-law principles. Except as provided by Section 9, any action or proceeding by either of the Parties to enforce this Agreement shall be brought only in any state or federal court located in the state of New York, county of Nassau. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

11.    <u>Arbitration</u>. The Parties agree that any dispute or controversy arising out of, in relation to, or in connection with this Agreement, or the making, interpretation, construction, performance or breach thereof, shall be finally settled by binding arbitration under the then current rules of the American Arbitration Association by one (1) arbitrator appointed in accordance with such rules; provided, however, that Employer may pursue a temporary restraining order and/or preliminary injunctive relief, with related expedited discovery for the Parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The arbitrator may grant injunctive or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court of competent jurisdiction. The costs of the arbitration, including administrative and arbitrator's fees, shall be shared equally by the Parties. Each Party shall bear the cost of its own attorneys, fees and expert witness fees. All proceedings shall be conducted in New York, Nassau County or other mutually agreeable site. The duty to arbitrate provided herein shall survive the termination of this Agreement. Except as otherwise provided herein, the Parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

12.    <u>Entire Agreement</u>. Except as otherwise set forth herein, this Agreement [and, if applicable, a separate offer letter agreement between Employee and Employer] contain all the understandings and representations between the Employee and the Employer pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

13.    <u>Modification and Waiver</u>. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by the Employee and the Employer. No waiver by either of the Parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power,

or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

14. <u>Severability</u>.

a. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding on the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

b. The Parties further agree that any such court is expressly authorized to modify any unenforceable provision of this Agreement in lieu of severing the unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making any other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law.

15. <u>Headings</u>. Captions and headings of the sections and paragraphs of this Agreement are intended solely for the convenience of reference and should not in any manner amplify, limit, modify or otherwise be used in the interpretation of any of the provisions of this Agreement.

16. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement, by facsimile, electronic mail in portable document format (.pdf), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, has the same effect as delivery of an executed original of this Agreement.

17. <u>Construction.</u> The parties have participated jointly, with counsel of their own choosing, in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement. Each party waives any right to such presumption.

18. <u>Acknowledgement.</u> Employee acknowledges that he has had the opportunity to consult with independent counsel of his own choice concerning this Agreement, and that he has taken advantage of that opportunity to the extent that he desires. Employee further acknowledges that he has read and understands this Agreement, is fully aware of its legal effect, and has entered into it voluntarily based on his own judgment.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date above.

EMPLOYEE:

EMPLOYER:

Brant Cherne

Hercules Pharmaceuticals, Inc.

Signature: _____
*Brant Cherne*
5A71673AA8A5414

By: _____
*Sara Amani*
DA56C407D559485

Print Name: __Brant Cherne_____

Print Name: __Sara Amani_____

Title: _Director of Business Development___

Date: _____4/21/2022_____

Title: __Chief Executive Officer_____

Date: _____1/28/2022_____

# EXHIBIT "D"

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

**HERCULES PHARMACEUTICALS, INC.**                    **24-Cv-5659 (JS)**

                    **Plaintiff,**                    **DECLARATION OF**
                                        **ISAAC ROSEN**

        **-against-**

**BRANT CHERNE,**

                    **Defendant.**
-----------------------------------------------------------X

       **ISAAC ROSEN**, declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct:

       1.     I am the Chief Executive Officer of NDC Distributors ("NDC"), who hired Brant Cherne ("Cherne") to commence employment on August 5, 2024.

       2.     I am unaware of any documents belonging to Hercules that are in NDC's possession.  To the extent that NDC is in possession of any of Hercules' documents, it will provide them to Hercules and then destroy them immediately.

       3.     The only two drugs Cherne and I discussed via text message were Lenalidomide/Revlimid (which we texted about on December 12, 2023, March 19, 2024, and March 27, 2024) and Sirolimus (which we texted about on March 26, 2024).

       4.     NDC has never sold Lenalidomide/Revlimid, so Hercules cannot claim that any of the discussions I had with Cherne about Lenalidomide/Revlimid since December 12, 2023 have caused it any damages.

       5.     NDC began selling Sirolimus prior to me meeting Cherne in August 2023.

       6.     NDC does not sell Sirolimus to Amber Specialty Pharmacy, Vivo Northwell, and Alpha Script which I am unaware if they are Hercules' customers.

7.      On November 8, 2023, I texted Cherne that I had a meeting scheduled with Vivo Northwell the following Monday.  This was many months before Cherne told me by text on March 26, 2024 that Vivo Northwell may dispense Sirolimus.

8.      Although Cherne stated in some of the text communications with me that he would call me on the phone to provide me with additional information, he never provided me with any additional information about Hercules on the phone.

9.      I am aware of the Employee Confidentiality and Non-Compete Agreement that Cherne and Hercules signed and have no intention for Cherne to sell drugs during at least the first year of his employment with NDC or to solicit any of Hercules' customers.  At NDC, Cherne will be exclusively in a manufacturer relations role where his focus is on enhancing relationships with manufacturers and expanding their pipeline by opening new lines of medicines for both retail and specialty markets and enhancing NDC distributorships.

Executed on September 12, 2024

*Isaac Rosen*
Isaac Rosen

2